1

2

3

4

5                         UNITED STATES DISTRICT COURT

6                        NORTHERN DISTRICT OF CALIFORNIA

7

8    HARRY W. BARTON, JR.,                          No. C 06-3646 SI (pr)

9                Petitioner,                         **ORDER DENYING HABEAS
                                                     PETITION**
10        v.

11   R. AYERS, warden,

12               Respondent.
     _____/
13

14                              **INTRODUCTION**

15        Harry W. Barton, an inmate at San Quentin State Prison, filed this <u>pro se</u> action seeking

16   a writ of habeas corpus under 28 U.S.C. § 2254.  This matter is now before the court for

17   consideration of the merits of the <u>pro se</u> habeas petition.  For the reasons discussed below, the

18   petition will be denied.

19

20                              **BACKGROUND**

21        Barton was convicted in Alameda County Superior Court of second degree murder and

22   was sentenced in 1979 to 15 years to life in prison.  His habeas petition does not challenge his

23   conviction but instead challenges a November 30, 2005 of the Board of Parole Hearings ("BPH")

24   that found him not suitable for parole.

25        The BPH identified the circumstances of the commitment offense, Barton's unstable

26   social history, the unfavorable psychological evaluation, and the need for further therapy as the

27   reasons for the determination that Barton was not suitable for parole.  Resp. Exh. 2 (reporter's

28   transcript of Nov. 30, 2005 BPH hearing (hereinafter "RT") at 88-92.  The specifics regarding

the crime and the circumstances supporting the finding of unsuitability are described in the Discussion section later in this order.

Barton sought relief in the California courts.  The Alameda County Superior Court denied his petition for writ of habeas corpus in 2006 in a short but reasoned order.  <u>See</u> Resp. Exh. 15. The California Court of Appeal and California Supreme Court summarily denied Barton's petitions for writ of habeas corpus.  <u>See</u> Resp. Exhs. 16-19.

Barton then filed his federal petition for a writ of habeas corpus.  The court found cognizable a claim that the evidence was insufficient to support the BPH's decision and ordered respondent to show cause why the writ should not issue.  Respondent filed an answer and Barton filed a traverse.  The matter is now ready for a decision on the merits.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged action concerns the execution of the sentence of a prisoner housed at San Quentin State Prison in Marin County, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  <u>See</u> 28 U.S.C. § 2254(b), (c).  The parties do not dispute that state court remedies were exhausted for the claim asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in

violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); <u>see</u> <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 409-13 (2000).   Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole.  <u>See</u> <u>Sass v. California Board of Prison Terms</u>, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

## DISCUSSION

A.      <u>Due Process Requires That Some Evidence Support a Parole Denial</u>

        A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability  proceedings.  <u>See</u> <u>Sass</u>, 461 F.3d at 1127-28; <u>Board of Pardons v. Allen</u>, 482 U.S. 369 (1987); <u>Greenholtz v. Inmates of Nebraska Penal & Corr. Complex</u>, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

        A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision.   <u>Sass</u>, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in <u>Superintendent v. Hill</u>, 472 U.S. 445, 454-55 (1985)).  "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the BPH.  <u>Sass</u>, 461 F.3d at 1128 (quoting <u>Superintendent v. Hill</u>, 472 U.S. at 455-56).  The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'"  <u>Id.</u> at 1129 (quoting <u>Superintendent v. Hill</u>, 472 U.S. at 457).  The some evidence

standard of <u>Superintendent v. Hill</u> is clearly established law in the parole context for purposes of § 2254(d).  <u>Sass</u>, 461 F.3d at 1129.

A critical issue in parole denial cases concerns the parole authority's use of evidence about the murder that led to the conviction.  Three Ninth Circuit cases provide the guideposts for applying the <u>Superintendent v. Hill</u> some evidence standard on this point: <u>Biggs v. Terhune</u>, 334 F.3d 910 (9th Cir. 2003), <u>Sass</u>, 461 F.3d 1123, and <u>Irons v. Carey</u>, No. 05-15275, slip op. 2469 (9th Cir. Mar. 6, 2007).  <u>Biggs</u> explained that the value of the criminal offense fades over time as a predictor of parole suitability:  "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . .  A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."  <u>Biggs</u>, 334 F.3d at 916-17.  <u>Biggs</u> upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole."  <u>Id.</u> at 916.  Next came <u>Sass</u>, which criticized the <u>Biggs</u> statements as improper and beyond the scope of the dispute before the court:  "Under AEDPA it is not our function to speculate about how future parole hearings could proceed."  <u>Sass</u>, 461 F.3d at 1129.  <u>Sass</u> determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability.  <u>See id.</u> (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing).  <u>Sass</u> also put to rest any idea from <u>Biggs</u> that the commitment crime and pre-offense behavior only support the initial denial of parole.   Recently, <u>Irons</u> determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence.  <u>Irons</u> emphasized that all three cases (<u>Irons</u>, <u>Sass</u> and <u>Biggs</u>) in which the court had "held that a parole board's decision to deem a prisoner

4

unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." <u>Irons</u>, slip op. at 2481.[1]  Interpreting this statement from <u>Irons</u> to suggest that the offense can only be relied on until the minimum number of years has been reached would suffer the same problem that <u>Sass</u> identified in <u>Biggs</u>: it is not the holding of the case.  The dicta in <u>Biggs</u> and <u>Irons</u> are speculative and do not determine when a denial of parole based solely upon the commitment offense or pre-offense behavior violates due process.  Neither logic nor <u>Irons</u> compel a decision that such reliance must cease when the prisoner reaches the minimum number of years in his sentence, such as the fifteenth year of a 15-to-life sentence.

The upshot of these three cases is that the BPH can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (<u>Sass</u>), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (<u>Biggs</u> and <u>Irons</u>). <u>Sass</u> did not dispute the principle that, other things being equal, a murder committed 50 years ago is less probative of a prisoner's current dangerous-ness than one committed 10 years ago.  Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to <u>Biggs</u> and <u>Irons</u>.  <u>Superintendent v. Hill</u>'s standard might be quite low, but it does require that the decision <u>not</u> be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.

What little guidance has come from the Supreme Court suggests that judicial review should be extremely deferential to the original decision-maker in the parole context.  In addition to the very low evidentiary standard that <u>Superintendent v. Hill</u> imposes, other Supreme Court comments suggest that the judiciary should be quite mindful of the subjective and predictive nature of a parole board's decision.  <u>See Greenholtz</u>, 442 U.S. at 13.  "No ideal, error-free way

---

[1]Interestingly, <u>Irons</u> was referring the actual number of years the inmate had been in prison and not the fictional number of years based on reductions for time credits.  In <u>Irons</u>, the inmate had been in custody 16 years on his 17-to-life sentence, having been convicted in 1985 and challenging at 2001 parole decision.  <u>See Irons</u>, slip op. at 2473-74.

1   to make parole-release decisions has been developed; the whole question has been and will
2   continue to be the subject of experimentation involving analysis of psychological factors
3   combined with fact evaluation guided by the practical experience of decisionmakers in
4   predicting future behavior.  Our system of federalism encourages this state experimentation."
5   Id.; see also id. at 8.

6       Past criminal conduct is not some arbitrary factor like eye color that  has nothing to do
7   with present dangerousness.  Recidivism concerns are genuine.  See Ewing v. California, 538
8   U.S. 11, 26 (2003) (O'Connor J.) (noting a report stating that over 60% of violent offenders were
9   arrested again within three years of their release).  California's parole scheme does not offend
10  due process by allowing the BPH to predict that an inmate presents a present danger based on
11  a murder he committed many years ago.

12      Having determined that there is a due process right, and that some evidence is the
13  evidentiary standard for judicial review, the next step is to look to state law because that sets the
14  criteria to which the some evidence standard applies.  One must look to state law to answer the
15  question, "'some evidence' of what?"

16

17  B.    State Law Standards For Parole For Murderers In California

18      California uses indeterminate sentences for most non-capital murderers, with the term
19  being life imprisonment and parole eligibility after a certain minimum number of years.  A first
20  degree murder conviction yields a minimum term of 25 years to life and a second degree murder
21  conviction yields a minimum term of 15 years to life imprisonment.  See In re Dannenberg, 34
22  Cal. 4th 1061, 1078 (Cal.), cert. denied, 126 S. Ct. 92 (2005); Cal. Penal Code § 190.  The
23  upshot of California's parole scheme described below is that a release date normally must be set
24  unless various factors exist, but the "unless" qualifier is substantial.

25      A BPH panel meets with an inmate one year before the prisoner's minimum eligible
26  release date "and shall normally set a parole release date. . . . The release date shall be set in a
27  manner that will provide uniform terms for offenses of similar gravity and magnitude in respect
28  to their threat to the public, and that will comply with the sentencing rules that the Judicial

6

Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[2]  The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal. Code Regs. § 2402(b).

The regulations contain a matrix of suggested base terms for several categories of crimes. See 15 Cal. Code Regs. § 2403. For example, for second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years, depending on some of the facts of the crime. Some prisoners estimate their time to serve based only on the

---

[2] The listed circumstances tending to show unsuitability for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior. 15 Cal. Code Regs. § 2402(c). The listed circumstances tending to show suitability for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior. 15 Cal. Code Regs. § 2402(d).

matrix.  However, going straight to the matrix to calculate the sentence puts the cart before the horse because it ignores critical language in the relevant statute and regulations that requires him first to be found suitable for parole.

The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity.  Dannenberg, 34 Cal. 4th at 1070-71.  Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole.  Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he panel shall set a base term for each life prisoner who is found suitable for parole").  The California Supreme Court's determination of state law in Dannenberg is binding in this federal habeas action.  See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).

The California Supreme Court also has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable.  "While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release."  Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

C.    Some Evidence Supports The BPH's Decision In Barton's Case

The BPH identified the circumstances of the murder, Barton's unstable social history, the unfavorable psychological report, and the need for further therapy as the reasons for its determination that Barton was not suitable for parole.  RT 88-92.

The Alameda County Superior Court upheld the decision in a reasoned order.  See Resp. Exh. 15.  The Alameda County Superior Court found that "there was certainly some evidence, including, but not limited to the committing offense, the contents of the psychological report by

Dr. Saunders, which, among other things, called into question the Petitioner's abilities to cope with stress in the outside world, Petitioner's lack of insight in dealing with conflict in intimate relationships, and Petitioner's failure to understand his risk factors for future violence." Id. The Alameda court correctly identified the "some evidence" standard as the applicable standard for judicial review, as evidenced by its citation to In re Rosenkrantz, 29 Cal. 4th 616 (Cal. 2002), which had cited and adopted the Superintendent v. Hill some evidence standard as the proper standard for judicial review of evidentiary sufficiency for parole denial cases. See Rosenkrantz, 29 Cal. 4th at 665-67.  Because the Alameda County Superior Court's decision is the last reasoned decision, that is the decision to which § 2254(d) applies. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005), cert. denied, 126 S. Ct. 2041 (2006).

### 1.   Commitment Offense

The crime was summarized in the Life Prisoner Evaluation Report available to the BPH:

> Victim Patty McKissick had been going out with defendant Harry Barton for approximately ten months prior to the instant offense.  During that time, she would also date other men, which angered and frustrated Barton.

> On Friday, November 17, 1978, at approximately 04:20 a.m., Ms. McKissick left her apartment en-route to her garage.  The garage, usually illuminated by a light, was dark. Subsequent investigation revealed the bulb had been unscrewed.  At approximately the same time that morning, a neighbor heard a woman screaming and called the Sheriff's Department.  Sergeant Leaper arrived on the scene and conducted a walking search of the garage.  As he located a repeating thudding sound, he observed Barton holding Ms. McKissick by the shoulders and throwing her to the concrete curb.  Approximately eight minutes and forty-five seconds had elapsed from the time of the call to the Sheriff's Department to the interruption of the beating.

> Upon arrest Barton was wearing leather gloves and boots, both of which were blood soaked.  Barton's right foot was inflamed and bruised from kicking Ms. McKissick. Attempts to revive Ms. McKissick were hampered because her face was mutilated to the point that her mouth could not be located.  Two bloody ink pens, one bent and broken, were found next to Ms. McKissick.  She suffered cuts to the face and scalp, a broken nose and broken teeth, seven stab wounds to the neck (three from an ink pen, four from a cutting type instrument), fractures of the facial bones and hemorrhage of the brain.  The cause of death was determined to be blunt injuries to the head and stab wounds to the neck.

Resp. Exh. 5, pp. 1-2.

The BPH considered a circumstance and factors proper under California law.  A

circumstance tending to indicate unsuitability for parole is that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner."  15 Cal. Code Regs. § 2402(c)(1).  The factors to be considered in determining whether that circumstance exists are that there were multiple victims, "[t]he offense was carried out in a dispassionate and calculated manner, such as an execution-style murder," "[t]he victim was abused, defiled or mutilated during or after the offense," "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and "[t]he motive for the crime is inexplicable or very trivial in relation to the offense."  15 Cal. Code Regs. § 2402(c)(1).

There was some evidence to support the BPH's determination that the circumstances of the murder indicated unsuitability.  Under state law, the BPH's finding of unsuitability for parole can be supported solely by facts of the commitment offense—beyond the minimum elements—that indicate that the prisoner is unsafe for release.  See Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th at 682-83.  The facts of this murder were far beyond the minimum elements of a second degree murder.  The attack lasted more than 8 minutes, involved multiple and different uses of force – multiple stabs, kicks so forceful that they caused bruising and inflammation of Barton's foot, and throwing the victim into a concrete curb – and was so extreme that the victim's face was mutilated. And there was some evidence to suggest premeditation, as the lightbulb that would have illuminated the area had been unscrewed and Barton was wearing gloves and heavy boots at the time he was caught killing McKissick.  The facts of the crime provide very solid support for the BPH's determinations that the "offense was carried out in a specially cruel and callous manner.  The offense was carried out in a dispassionate manner.  The victim was abused and mutilated during the offense. . . .[and] . . . this offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering." RT 88-89.

Although the murder conviction was apparently Barton's first conviction, he admitted that he previously had physically assaulted the victim as well as his wife.  RT 28-30.  The BPH did not separately identify it, but this previous record of violence also would weigh against a finding of suitability for parole.  15 Cal. Code Regs. § 2402(c)(2).

2.      Unstable Social History

The BPH relied on Barton's unfavorable social history, which included alcoholism, in support of its decision to find him unsuitable for parole. Barton admitted his alcohol and methamphetamine abuse before the murder. RT 30-33. The psychologist's evaluation included a diagnosis of alcohol dependency in institutional remission and methamphetamine abuse in institutional remission. Resp. Exh. 10, p. 1. There was some evidence to support the BPH's reliance on the unstable social history as tending to show unsuitability.

3.      Unfavorable Psychological Evaluation

The BPH can consider psychological factors in determining parole suitability because it is required to consider all relevant reliable information, including information about "past and present mental state, [and] past and present attitude toward the crime." 15 Cal. Code Regs. § 2402(b).

Barton's psychological evaluation was quite unfavorable. The psychologist stated, among other things, that Barton did not have any insight about what risk factors specifically would lead to his inflicting severe injury or death on another person in the future, had no insight about what part he might have played in the dynamics of past intimate relationships that upset him, and did "not appear to understand the concept of rage and the risk factors associated with the triggering of rage." Resp. Exh. 10, pp. 3-8.

> Mr. Barton has exhibited some limited insights into his crime and to a degree what the impact of his crime has had on himself and on others. Issues concerning (1) rage, (2) what part he plays in relationships that might result in violence, and (3) what steps he must take to anticipate high-risk factors that could lead him to violent behavior are relatively unexplored. He does not have a feasible risk management plan in place to manage these factors. This leaves him more likely to find himself in high-risk situations for violence, possibly without realizing what chain of behaviors led him to that point. He does not currently see himself as potentially at risk, which is in itself another risk factor. Any relapse into drug or alcohol abuse would pose a very high risk situation.

Id. at 7. The psychologist thought that additional therapy and group work could significantly affect Barton's clinical and risk management factors. Id.

The BPH read portions of that unfavorable report into the record at the hearing, RT 2-3,

5-7, and relied on it as support for the decision. "[F]rankly, this report raises a lot of troublesome issues, and issues that I think you're going to have to take some time to resolve." RT 90. There was substantial evidence to support the BPH's reliance on the unfavorable psychological evaluation in determining that Barton was not suitable for parole.

The psychologist's 2004 opinion that Barton has only limited and recent understanding of the rage that led him to commit such a brutal murder and how to handle conflict in the future is stunning as it was made more than 25 years after the murder and as to a person who was 61 years old. It is rather late in his sentence and in life to have just a nascent understanding of a rage problem and how to handle conflict when adversity, conflict and rejection certainly would be in his future if he were released from prison. Barton's tenuous grasp on his anger management problem is even evident in the transcript of the BPH hearing, which shows Barton repeatedly interrupting, arguing, and getting into shouting matches with the hearing officers. See, e.g., RT 52-53 (arguing about whether his wife benefitted financially by his incarceration and their divorce), 70-71 (arguing about whether his sewing machine repair career plans were feasible), 75 (commissioner took a pen away from Barton because Barton was starting to lose his temper), 99 (commissioner and Barton "[b]oth shouting loudly over each other"). And his attitude about his need to address his alcoholism problem didn't appear particularly positive when he responded to a question about coping with conflict with this comment: "Well, I'm going to be stuck with AA so I would be calling my sponsor." RT 79.

There was some evidence to support the BPH's determination that Barton's psychological evaluation tended to show unsuitability for parole.

4.    Need For Further Therapy

The BPH found that Barton needed further "therapy in order to face, discuss, understand and cope with stress in a non-destructive manner." RT 92. For the reasons stated in the preceding section, this was a factor that could be relied on and there was some evidence to support the BPH's reliance on it.

5.      Summary

The BPH noted that Barton had various in-prison achievements but concluded that the positive factors did not outweigh the factors above showing unsuitability.  The factors listed by the  BPH in support of its determination that Barton was not suitable for parole had some evidentiary support.  And the factors were factors that could be considered in determining parole suitability.  The Alameda County Superior Court's rejection of Barton's insufficient evidence claim was not contrary to or an unreasonable application of the Superintendent v. Hill some evidence standard.  Barton is not entitled to the writ.


# CONCLUSION

For the foregoing reasons, the petition is denied on the merits.  The clerk shall close the file.

IT IS SO ORDERED.

DATED: April 10, 2007

_____
SUSAN ILLSTON
United States District Judge